**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| JOSEPH CEDRIC SHELTON | CIVIL ACTION |
| VERSUS | NO. 09-968 |
| BOARD OF SUPERVISORS OF SOUTHERN UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE, ET AL. | JUDGE BRADY |
| | MAGISTRATE JUDGE NOLAND |

## RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND SOUTHERN UNIVERSITY SYSTEM FOUNDATION'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

This matter is before the Court on several motions filed by the Board of Supervisors of Southern University and Agricultural and Mechanical College ("Board"); the Southern University System Foundation ("Foundation"); and defendants Kassie Freeman ("Freeman"), both individually and in her official capacity as Interim President of Southern University; Tony Clayton ("Clayton"), both individually and in his official capacity as a member of the Board of Supervisors of Southern University; Patrick Magee ("Magee"), both individually and in his official capacity as a member of the Board of Supervisors of Southern University; and Ernie Hughes ("Hughes"), both individually and in his capacity as Interim Executive Director of the Foundation (collectively, "Defendants") against Plaintiff Joseph Cedric Shelton ("Shelton"). Specifically, the Foundation moved to dismiss Shelton's conspiracy claim (Doc. 42) and moved for partial summary judgment on most of the other claims against it (Doc. 43). The Board filed a motion for summary judgment (Doc. 44) for itself, Freeman, Clayton, Magee, and

Hughes regarding most of Shelton's claims. Shelton filed opposition motions to these motions (Docs. 48, 49, and 50), and the Foundation filed reply briefs (Docs. 51 and 52) in support of both its original motions. Shelton has not counter-moved for summary judgment on his claims, and the Foundation's counterclaim against Shelton is also still pending. Oral argument is not needed in this case. Federal question jurisdiction exists under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims exists based on 28 U.S.C. § 1367.

## FACTUAL BACKGROUND

Shelton asserts that a series of retaliatory actions by Defendants led to his eventual termination under auspices of budget cutbacks. The following facts are undisputed. Shelton was employed by the Southern University System, under the governance of the Board of Supervisors, and since 2006 served as the Assistant to the Director of Alumni Affairs. (Shelton Affidavit, Doc. 49-3, ¶ 2). All his positions with Southern were deemed unclassified, non-tenured, at-will employment. (Shelton Deposition, Doc. 44-6, pp. 159-160). In June 2007, he testified in *Slaughter v. Board of Supervisors of Southern University, et al.*, No. 3:07-cv-739-RET-CAN, regarding complaints of sexual harassment lodged by female employees against various university officials. (Shelton Aff., Doc. 49-3, ¶ 3). His testimony also described personal instances of being himself sexually harassed by then-Board member Dale Atkins. (*Id.*, ¶ 4). Shelton testified that he relayed these reports to several superior officials, including Atkins and defendant Clayton. (*Id.* ¶ 3). Shelton also lodged an internal complaint with Southern human resources regarding Atkins' sexual harassment of him. (*Id.*, ¶ 4; Letter on Fear of Reprisal, Doc. 44-12, Ex. 3).

Clayton informed Shelton of his displeasure with being brought into the *Slaughter* affair on numerous occasions from that point until his termination. (*Id.* ¶ 5-7, 11-12, 14-15, 18, 20, 22). On June 5, 2008, Shelton accepted a settlement with the Board whereby he received compensation in exchange for releasing any and all past or present claims against Southern, its employees or affiliates. (Settlement Agreement, Doc. 44-8). In March 2009, Slaughter was terminated from his position as president of the university. (Shelton Aff., Doc. 49-3, ¶ 19). On July 16, 2009, Hughes sent a letter to a Foundation employee requesting the return of certain documents Hughes said the employee and Shelton had removed from the Foundation. (Hughes Letter, Doc. 43-4, Ex. E, p. 6). The letter was circulated to Clayton and Freeman, among others (*id.*), and Shelton received the letter in the following days. (Shelton Aff., Doc. 49-3, ¶¶ 25-26). Shelton responded to the letter by demanding a recanting of Hughes' allegation, but he received no response. (*Id.* ¶ 27; Shelton Response Letter to Hughes Letter, Doc. 43-3, Shelton Ex. 2, p. 218).

On July 24, 2009, Freeman presented the Board with a plan to reorganize and restructure the university's workforce, which included the elimination of Shelton's position, but the Board did not approve that plan. (Statement of Uncontested Facts, Doc. 44-2, ¶ 21). Having received notice of the plan to terminate his position, Shelton filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against the Board on August 11, 2009, alleging discriminatory termination based on retaliation. (EEOC Notice of Charge of Discrimination, Doc. 44-9). The Board approved a revised version of Freeman's reorganization plan at its August 22 meeting, which effected Shelton's termination. (Minutes of Board's August 22 Meeting, Doc. 44-11, p.2).

## SUMMARY OF CLAIMS

Plaintiff Shelton has brought several claims against each defendant, which may be summarized as follows: a Title VII discriminatory termination claim against the Board (Complaint, Doc. 1, ¶¶ 3, 27) and the Foundation (*id.* ¶ 5) under 42 U.S.C. § 2000e *et seq.*; a retaliation claim against the Foundation, Hughes, Clayton, Freeman and Magee under 42 U.S.C. § 1983 (*id.* ¶ 4); a Louisiana statutory claim under the whistleblower statute, La. R.S. 23:967, against the Foundation (*id.* ¶¶ 31, 34); a retaliation conspiracy claim against the Foundation, Hughes, Clayton, Freeman, and Magee under 42 U.S.C. § 1985 (*id.* ¶¶ 4, 26); a defamation claim against the Foundation and Hughes (*id.* ¶ 30); an intentional infliction of emotional distress claim against the Foundation, Hughes, Clayton, Freeman and Magee (*id.* ¶ 28); and a Louisiana tort claim for abuse of rights against the Board, Clayton, Freeman and Magee (*id.* ¶ 29).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. Rule Civ. P. 56(a). The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the burden at trial rests on the non-moving party, as it does here, the moving party need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Id.* The moving party may do this by showing that the evidence is insufficient to prove the existence of one or more essential elements of the non-moving party's case. *Id.* A party must support its summary judgment position by "citing to particular parts of materials in the record" or

"showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. Rule Civ. P. 56(c)(1).

Although this Court considers the evidence in a light most favorable to the non-moving party, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes v. Tex. Dep't of Mental Health*, 102 F.3d 137, 139-40 (5th Cir. 1996). Similarly, "[u]nsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence." *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991), *cert. denied*, 507 U.S. 1051. If, once the non-moving party has been given the opportunity to raise a genuine fact issue, no reasonable juror could find for the non-moving party, summary judgment will be granted for the non-moving party. *Celotex*, 477 U.S. at 322.

## SHELTON'S TITLE VII DISCRIMINATION CLAIM AGAINST THE BOARD AND THE FOUNDATION

After reviewing Shelton's complaint, accompanying affidavits, the exhibit showing his EEOC complaint and right to sue letter, and other relevant materials, the Court finds that no genuine issue of material fact exists between Shelton and the Foundation on this claim. The Foundation is therefore entitled to summary judgment on this claim.

The parties contest whether the Foundation is Shelton's actual employer and whether Shelton exhausted his administrative remedies against the Foundation. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, requires plaintiffs pursuing discrimination claims to first exhaust administrative remedies. Shelton admits that he failed to exhaust his administrative remedies with respect to the

Foundation. (Plaintiff's Memo. in Opp. to Defendant's Motion for Partial Summ. Judgment, Doc. 49-2, at 2-3). However, Shelton seeks to invoke an exception to the normal exhaustion requirement. The exceptions are: 1) where there is a clear identity of interests between the unnamed party and the party named in the charge; and 2) the unnamed party has unfairly prevented the filing of the EEOC charge. *Way v. Mueller Brass Co.*, 840 F.2d 303, 307 (5th Cir. 1988). Shelton has not alleged foul play by the Foundation in this context, and so the only issue is whether a "clear identity of interests" exists between the Board and the Foundation.

Different courts use different tests in evaluating identity of interests, but the courts in this circuit have continuously determined that the exception is not available to a party represented by counsel before the EEOC. *See, e.g., Fassbender v. Treasure Chest Casino*, No. 07-5265, 2008 WL 170071, at **5-6 (E.D. La. Jan. 16, 2008). It is undisputed that Shelton is not an attorney and had not retained an attorney when he filed his EEOC complaint on July 28, 2009. However, he retained counsel in the form of Ms. Collette Griggs at least by September 1, 2009, when she sent a letter to the EEOC on his behalf. (Letter to EEOC by Shelton counsel, Doc. 43-4, Ex. C). The period between the charge filing and Shelton's retention of counsel is not, as Shelton would have it, "long before he acquired legal representation." (Plaintiff's Memo. in Opp. to Defendant's Motion to Partial Summ. Judgment, Doc. 49-2, p. 4). Shelton did not receive his right-to-sue letter until October 21, 2009. (EEOC Right-to-Sue Letter, Doc. 43-4, Ex. D). Indeed, it is quite telling that Shelton's then-attorney requested that additional documentation be added to Shelton's original charge in the EEOC letter. (Letter to EEOC by Shelton counsel, Doc. 43-4, Ex. C). Counsel's substantial

involvement with representation at the administrative stage—the EEOC itself recognized he was represented by counsel in the right-to-sue letter—suffices to defeat Shelton's attempted reliance on the identity of interests exception. (Right-to-Sue Letter, Doc. 1-1). Shelton had the substantial assistance of counsel while his complaint was pending before the EEOC, and he therefore cannot rely on the identity of interests exception. Thus, even if Shelton has put forth sufficient evidence to defeat summary judgment on the issue of whether the Foundation was his employer's agent, his claim still fails. The Court therefore grants summary judgment in favor of the Foundation on Shelton's Title VII claim based on his unexcused failure to exhaust his administrative remedies.

Shelton also asserted a retaliation claim under Title VII against the Board, which was properly named in his EEOC complaint. Shelton points to his testimony in a prior federal court case, *Slaughter v. Bd. of Supervisors of Southern Univ. and Agricultural and Mechanical College*, No. 3:07-cv-379-RET-CAN, as a protected activity. That litigation involved retaliation claims by Southern University's former president against the Board and certain university officials, including Board members, for his reports of sexual harassment. Shelton testified in that matter on June 22, 2007. (Shelton Aff., Doc. 48-3, ¶¶ 3-4).

The Board first argues that a settlement agreement Shelton and the Board entered into on June 5, 2008 precludes reference to his testimony in the *Slaughter* matter as a basis for his Title VII claim. (*See* Settlement Agreement, Doc. 44-8, p. 2, ¶ 2). Shelton argues that the settlement relates only to his testimony regarding sexual harassment by former Board member Dale Atkins, not to the *Slaughter* matter. (Shelton

Aff., Doc. 48-3, ¶¶ 16; Slaughter Aff., Doc. 48-4, ¶ 6).   The settlement agreement contained a general release paragraph that reads in pertinent part:

> Shelton … expressly releases and forever discharges … the Southern University Board of Supervisors … from any and all liability or damage of any nature or kind whatsoever, whether known or unknown, as of the date of this Agreement … including, but not limited to … all claims relating to his employment inclusive of his claims of discrimination and retaliation, as well as any and all claims and demands, past or present, arising under the laws of the State of Louisiana or the laws or constitution of the United States of America, including but not limited to, Louisiana Revised Statute 23:967 … Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2003 *et seq*. … and any other federal state or local law, regulation, [or] ordinance. This is a GENERAL RELEASE and should be construed as broadly as possible.

It is difficult to conceive that a release this broad would only apply to the single matter to which Shelton refers.   Shelton's testimony in 2007 in both the Slaughter and Atkins matters is included in this broad language.

Federal courts give preclusive effect to state court judgments (or, in this case, a settlement agreement) to the same extent that a state court would.   *St. Paul Mercury Ins. v. Williamson*, 224 F.3d 425, 436 (5th Cir. 2000).   Louisiana's version of issue preclusion law provides that "[a] judgment in favor of either the plaintiff or the defendant is conclusive in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment."   La. R.S. 13:4231(3).   "A compromise has the legal efficacy of a judgment that possesses 'a force equal to the authority of things adjudged.'"   *Trahan v. Coca Cola Bottling Co. United, Inc.*, 894 So.2d 1096, 1108 (La. 2005) (citing La. C.C. art. 3078, the predecessor of current Article 3080).   A settlement agreement or "compromise" precludes the parties thereto from bringing a subsequent action based upon the matter compromised.   La. C.C. art. 3080.   The translation to this litigation is simple:   if a settlement agreement

compromises a matter, that matter is issue precluded from further litigation. The matter compromised in this case was, based on the release contained in the settlement agreement, quite broad, but in any event it covered whatever Title VII claims Shelton had or may have had as of the date of the agreement, June 5, 2008. Therefore, any claims arising under Title VII prior to June 5, 2008 are considered precluded from litigation by the settlement agreement. Shelton must therefore rely, if at all, on events occurring after that date to form the basis for his Title VII claim.

The Board next argues that Shelton's proffered instances of discrimination are time-barred. Shelton asserts that the backlash he endured from Board members following the *Slaughter* testimony constituted a "continuing violation." (*Id.*, ¶¶ 5-34). Shelton has alleged a series of misdeeds that he argues constitute a continuing violation that began in 2007 but continued until the time he was terminated under auspices of the reorganization plan. Under Title VII, a plaintiff must file a charge with the EEOC within 180 days of the allegedly unlawful employment practices. 42 U.S.C. § 2000e-5(e)(1). However, if the unlawful conduct constitutes a continuing violation, events occurring outside the 180-day window may be included. *See Messer v. Meno*, 130 F.3d 130, 134-35 (5th Cir. 1997). What qualifies as a continuing violation depends on (1) the subject matter—whether the alleged acts are similar; (2) the frequency—whether the alleged acts are frequent or isolated; and (3) the degree of permanence—whether the act is of such a permanent type that the employee should be alerted as to its seriousness. *Huckabay v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998). Courts focus on whether an average person would have been alerted that his rights needed to be protected. Shelton cannot use events prior to June 5, 2008 as the sole basis for his

current Title VII complaint due to the settlement agreement. However, the settlement agreement did not purport to extinguish future discriminatory actions, and Shelton has alleged that the pattern of discrimination leading up to the settlement agreement, and settled by it, continued past June 5, 2008.

Based on the *Huckabay* factors, the Court finds Shelton has alleged sufficient facts to allow a reasonable fact finder to conclude that actions after June 5, 2008 could have formed the basis for a valid Title VII claim. Specifically, Shelton's affidavit points to several instances where he was either threatened with recriminations should he complain (Doc. 48-3, ¶¶ 17-18, 21) or reminded of lingering ill-will remaining from his Slaughter testimony (*id.*, ¶¶ 20, 32). The subject matter of those alleged acts are similar in nature, and Shelton has alleged those acts have occurred on a frequent basis following his testimony until his termination. Moreover, the degree of permanence to those threats and expressions of anger were not so concrete as to alert Shelton to their seriousness. Indeed, while Clayton's comments caused their friendship to sour (Shelton Aff., Doc. 49-3, ¶ 20), Shelton still believed his employment was safe because Clayton was protecting him. (*See* Shelton Depo., Doc. 43-3, pp. 174-180). Thus, up until the time his position was put into the reorganization plan, an average person in Shelton's shoes could have believed that Clayton's anger with him was personal, not professional. Because equitable considerations have led the Fifth Circuit to conclude that "a persisting and continuing system of discriminatory practices … that produces effects that may not manifest themselves as individually discriminatory except in cumulation over a period of time" permits plaintiffs to rely on some events that fall outside the statutory period of limitations, the Court finds that questions of fact remain in

dispute as to whether Shelton should have been on notice that his job was seriously in jeopardy. Consequently, the Court must conclude that genuine disputes of material fact remain surrounding the invocation of the "continuing violation" theory.

The Board finally argues that, even if preclusion and limitations considerations fail to dispose of Shelton's claim, his claim simply fails to meet the elements of a retaliation claim. To establish a *prima facie* case of retaliation, Shelton must show: 1) he engaged in conduct protected by Title VII; 2) his employer took an adverse employment action against him; and 3) a causal connection exists between the protected activity and the adverse action. *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008). If Shelton makes such a showing, the burden shifts to the Board to "articulate a legitimate … non-retaliatory reason for its employment action. *Id.* (internal citations and quotations omitted). If the Board meets that burden of production, the plaintiff bears the burden of proving the reason for the adverse action served as a pretext for retaliation. *Id.* (citation omitted).

The Board concedes that it was Shelton's employer, that his termination qualifies as an adverse employment action, and that Shelton's testimony in the *Slaughter* and Atkins matters qualifies as protected activity. Instead, it focuses on the lack of causal connection between the two events. (*See* Defendants' Opp. to Motion to Summ. Judgment, Doc. 44-1, pp. 4-5). The Board simply contends that the lack of temporal proximity between the testimony and the adverse action, coupled with intervening circumstances, necessarily vitiates causation. The Board claims that Shelton's protected activity "is two years and two presidents removed from the decision to terminate his employment." Shelton contends that the conspiracy hatched to retaliate

against him ripened at the time of his protected activity, but did not come to fruition until the composition of the Board changed enough to swing the voting power away from Dr. Slaughter and his allies. (*See* Shelton Aff., Doc. 48-3, ¶¶ 5, 12, 14, 19, 21-22). The Board also cites the reorganization plan proposed by Interim President Freeman as a neutral, legitimate basis for the adverse action, claiming that Shelton has failed to show otherwise.

The Court finds that Shelton met his burden for showing a *prima facie* case for retaliation since he alleged the voting power of the Board finally swung against *Slaughter* and his allies in 2009, thereby explaining the temporal delay between Shelton's protected activity in 2007 and the adverse employment action in 2009. While the Board has furnished a legitimate reason for that action, Shelton has nonetheless put the potentially pretextual nature of that decision in genuine dispute insofar as his allegations surrounding the possible animus several Board members may have harbored him for his *Slaughter* testimony could form the actual reason for his termination. Summary judgment on the Title VII claim against the Board is therefore improper.

## SHELTON'S STATE LAW RETALIATION CLAIM AGAINST THE FOUNDATION

## UNDER LA. R.S. 23:967

La. R.S. 23:967, Louisiana's whistleblower statute, prohibits employers from taking reprisals against employees who in good faith notify employers of violations of the law and thereafter disclose, or threaten to disclose, workplace acts or practices which violate the law. While the whistleblower statute does not define "employer," it has become common practice to use the definition contained in Louisiana's employment

discrimination law, La. R.S. 23:302(2). *See, e.g., Johnson v. Hospital Corp. of America*, 767 F.Supp.2d 678, 691 n.2 (W.D.La. 2011); *Langley v. Pinkerton's Inc.*, 220 F.Supp.2d 575, 580 (M.D.La. 2002); *but see Knighten v. State Fair of La.*, 2006 WL 725678 (W.D.La. 2006) (declining to apply § 302's definition of "employer" to § 967). The pertinent part of that statute's definition of employer is as follows:

> [A] person, … legal or commercial entity, the state, or any state agency, board, commission, or political subdivision receiving services from an employee and, in return, giving compensation of any kind to an employee. The provisions of this Chapter shall apply only to an employer who employs twenty or more employees within this state for each working day in each of twenty or more calendar weeks in the current or preceding calendar year….

La. R.S. 23:302(2). As in the Title VII context, the Foundation argues that it is exempt from this statute because it employs fewer than the statutory minimum needed to qualify under the definition. Unlike in Title VII, where the definition embraces not only "employers" who have fifteen or more employees but also agents of such employers, the definition in Louisiana's employment statute does not include agents within its definition. Therefore Hughes' uncontested statement that the Foundation does not and has never employed that amount of employees becomes more relevant. (Hughes Aff., Doc. 43-4, Ex. B, ¶ 8). But the § 302(2) definition makes an important caveat to its limit on applicability: only the provisions "of this Chapter" apply the exemption for employers with under 20 employees. "[T]his Chapter" as referenced in 23:302(2) refers to Chapter 3-A of Title 23 of the Louisiana Revised Statutes. The whistleblower statute is contained in Chapter 9 of Title 23, and therefore the exemption appears inapplicable to 23:967 based on 23:302's own terms. However, a long line of cases have held that despite the putatively limited confines § 302(2) places on itself, its full definition applies

to 23:967 regardless of the fact that 23:967 is "found in Chapter 9 rather than in 3-A." *Langley v. Pinkerton's Inc.*, 220 F.Supp.2d 575, 580 (M.D.La. 2002) (citing *Jackson v. JCC Holding Co.*, No. 01-1659, 2002 WL 1482756, at *6 (E.D.La. July 8, 2002)). Indeed, *Jackson* found that Xavier University was exempted from the ambit of 23:967 by virtue of 23:302(2)(b)'s exclusion of any "private educational or religious institution or any nonprofit corporation" from its definition of "employer." 2002 WL 1482756, at *6. The *Nighten* case found otherwise and declined to follow the authorities broadly applying § 302 to § 967, applying instead a common law test to determine the existence of an employment relationship. 2006 WL 725678, at *1. This Court previously found that the exception for non-profit corporations embodied in § 302(2)(b) was not necessarily embraced in § 967. *Upshaw v. Bd. of Sup's of Southern Univ.*, No. 10-184, 2011 WL 2970950, *4 (M.D.La. July 19, 2011). However, this Court has not had opportunity to expressly decide whether § 302(2)'s exclusion of employers of under twenty employees applies to § 967.

The uncontested facts disclose that the Foundation qualifies as a nonprofit corporation (Statement of Uncontested Facts, Doc. 43-1, ¶ 1) and an employer with fewer than 20 employees (*id.*, ¶ 5; Hughes Aff., Doc. 43-4, Ex. B, ¶ 8). Since the Foundation fails to meet § 302(2)'s threshold number of employees and § 302(2)(b) expressly excludes it as a nonprofit corporation, the Foundation cannot be held liable under La. R.S. 23:967 if the Court adopts the widely accepted notion that § 967's definition of "employer" embraces § 302(2)'s definition without restriction, despite some language in § 302(2) to the contrary.

However, the Court has no occasion to make such a ruling at this time, as there is simply no evidence to support Shelton's assertions that he was paid "compensation" by the Foundation.  His naked assertions of receiving a supplemental salary from the Foundation find no support in the record.[1]  Plaintiff's assertion that he received reimbursement is likewise not supported by any record evidence.  Moreover, it is doubtful whether expense reimbursements would qualify as a type of compensation recognized by §967 via § 302(2).  *See Dejoie v. Medley*, 9 So.3d 826, 829 (La. 2009) (holding that factors to consider in determining whether compensation given is whether defendant paid plaintiff's wages or withheld taxes from his paycheck or whether plaintiff participated in defendants' benefits plan).  Shelton refers to deposition testimony from Walter Dumas, a Board member not a party to this case, and from Hughes; however, neither deposition is in the record in this case.  Summary judgment in favor of the Foundation is therefore granted on this claim based on the lack of evidence that the Foundation compensated Shelton.

## SHELTON'S DEFAMATION CLAIM AGAINST THE FOUNDATION AND HUGHES

While each defendant argues that summary judgment should be granted as to all claims made by Shelton, neither the Foundation (Doc. 43) nor Hughes (Doc. 44-1) bothered to brief the issues surrounding the defamation claim brought against them. The Court declines to address them *sua sponte*, and thus those claims remain pending.

## SHELTON'S ABUSE OF RIGHTS CLAIM AGAINST THE BOARD AND BOARD MEMBERS

---

[1] The Court notes that Shelton's reference to his affidavit as support for this proposition is simply incorrect. Nowhere does his affidavit contain any assertion of payments from the Foundation.  (*See* Doc. 48-3).

The abuse of rights doctrine has maintained an uncertain position in Louisiana jurisprudence. *Lambert v. Maryland Cas. Co.*, 403 So.2d 739, 755-57 (La. App. 4th Cir. 1981) documents its origin and history, finding that the then-current state of the law defined the doctrine as follows:

> An analysis of these Louisiana cases which touch upon the abuse of rights doctrine shows that, depending on the facts and circumstances of each case, for one to be held in damages for exercising a right legally conferred upon him there must exist (1) no benefit to the person exercising the legal right, and (2) damage or injury to the person against whom the legal right is asserted.

*Id.* at 757. The Louisiana Supreme Court soon altered the elements necessary to show an abuse of rights. In *Massachusetts Mut. Life Ins. v. Nails*, 549 So.2d 826 (La. 1989), the Court laid out the following conditions justifying a finding of abuse of rights:

> (1) if the predominant motive for it was to cause harm;
> (2) if there was no serious or legitimate motive for refusing;
> (3) if the exercise of the right to refuse is against moral rules, good faith, or elementary fairness; [or]
> (4) if the right to refuse is exercised for a purpose other than that for which it is granted.

*Id.* at 828-29 (citations omitted). The Court recognized that the doctrine "has been invoked sparingly in Louisiana" because "its application renders unenforceable [the defendant's] otherwise judicially protected rights. *Id.* at 828 (citations omitted). The Fifth Circuit has recognized that this doctrine can be applicable in the employment setting. *Walther v. National Tea Co.*, 848 F.2d 518, 519-20 (5th Cir. 1988) (citing *Ballaron v. Equitable Shipyards, Inc.*, 521 So.2d 481 (La. App. 4th Cir. 1988)). The most current formulation of the abuse of rights doctrine is laid out in *Mixon v. Iberia Surgical, L.L.C.*, 956 So.2d 76, 81 (La. App. 3d Cir. 2007). The doctrine applies if one of the following conditions is met:

(1) the predominant motive for exercise of the right is to cause harm;
(2) there is no legitimate motive for exercise of the right;
(3) exercise of the right violates moral rules, good faith, or elementary fairness; or
(4) exercise of the right is for a purpose other than that for which it was granted.

*Id.* Shelton's complaint makes clear that the right at issue here is the Board's ability to terminate him, as that adverse action (and its allegedly retaliatory nature) forms the foundation for all of Shelton's claims. (Complaint, Doc. 1, ¶ 29). As such, only the Board and its members—Clayton, Freeman and Magee—are implicated here.[2]

The four conditions for applying the doctrine all implicate the motive of the exerciser of the right. Since the Board cannot have a motive apart from that of its members, the motives of Freeman, Clayton and Magee in terminating Shelton via the reorganization plan adopted by the Board become the relevant considerations.

To begin, the Court fails to detect any allegation giving rise to a complaint against Magee. The sole instance of Shelton's contact with Magee was a conversation they had about the letter Hughes circulated regarding the missing documents. (Shelton Depo., Doc. 43-3, pp. 172-73). After Shelton asks Magee what he should do about the letter, Shelton says Magee responded, "Dr. Freeman is entitled to pick the people that she wants…I don't know what to tell you. You're going to have to find your own way." (*Id.*) Shelton has failed to show the Court any facts giving rise to a constitutional violation by Magee. No showing has been made that Magee's vote in favor of the

---

[2] To the extent the complaint can be read to implicate all defendants (i.e., including the Foundation and Hughes) in this claim, summary judgment in favor of the Foundation and Hughes is appropriate, as neither party had the "right" to terminate Shelton, and thus neither could abuse that right.

reorganization plan was motivated by animus towards Shelton's activities. Summary judgment in favor of Magee is therefore proper.

The Court finds that there are genuine disputes of material fact regarding Clayton and Freeman, and thus the Board. According to Shelton, he was subjected to repeated acts of harassment at the hands of Clayton (Shelton Aff., Doc. 48-3). Shelton filed his EEOC complaint on August 11, 2009, and the Board passed Freeman's reorganization plan on August 22, 2009, mere days after he filed his complaint. Shelton also alleges that he was told he would lose his job if he failed to pledge his allegiance to Freeman, renounce his loyalty to Slaughter, and give up his EEOC complaint. (Shelton Aff., Doc. 49-3, ¶¶ 22, 29, 32). A reasonable fact finder could believe the motive of the Board and its members Clayton and Freeman in including Shelton's position in the reorganization plan was to retaliate against him for his prior testimony in the *Slaughter* action or in the Atkins matter. Dismissal on summary judgment with regard to Freeman, Clayton, and the Board is therefore inappropriate on this claim.

### SHELTON'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM AGAINST THE FOUNDATION, HUGHES, CLAYTON, FREEMAN AND MAGEE

Shelton asserts that the individual defendants intentionally inflicted emotional distress on him. The elements for a claim of intentional infliction of emotional distress ("IIED") are as follows:

> (1) The conduct of the defendant was extreme and outrageous;
> (2) The emotional distress suffered by the plaintiff was severe;
> (3) The defendant desired to inflict severe emotional distress or knew that the severe emotional distress would be certain or substantially certain to result from the complained-of conduct.

*White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991).[3]  Shelton argues that the alleged conspiracy of the defendants to retaliate against him for his protected activity in and of itself creates a genuine issue of material fact on this claim.  He also points to the possibility that "a greater degree of protection from insult and outrage" may apply when "a supervisor with authority over him" acts to cause the alleged injury.  *Id.* at 1210. Finally, Shelton nakedly asserts that his Xanax prescription proves the requisite amount of emotional injury to permit recovery.  (Plaintiff's Opp. to Defendant's Motion for Summary Judgment, Doc. 48-2, p.16).  The defendants argue that mere existence of a wrongful termination claim presents a necessary but not necessarily sufficient basis for establishing an IIED claim.  The defendants also assert that no showing of intent to inflict emotional distress had been made.

The Court simply remains unconvinced that the factual allegations brought forward by Shelton depart so starkly from the "bounds of decency" as "to be regarded as atrocious and utterly intolerable in a civilized community."  *Monsanto*, 585 So.2d at 1209.  Even accepting Shelton's premise that the actions of his superiors at Southern need only meet the watered-down IIED elements, the Court fails to detect in Shelton's allegations anything constituting more than garden-variety academic politics.  While the allegations are serious in their own right, they only suffice only to put into issue "insults,

---

[3] As in that case, the alleged intentional acts giving rise to the IIED claim in this case occurred in the workplace. While worker's compensation normally presents the exclusive remedy for work-related injury caused by a co-employee, intentional torts are excepted from worker's comp coverage.  While the *Monsanto* Court adopted the common law's definition of IIED, 585 So.2d at 1209, which permits recovery for reckless acts when the other elements are met, *id.*, n.3, the Court also noted that reckless acts in the workplace would nonetheless fall under the worker's comp scheme, *id.*, n.4, and therefore obviated the need for the Court to consider reckless but not "intentional" IIED claims in that case.  For the same reasons, Shelton's IIED claim here calls for analysis of only truly intentional IIED acts.

indignities, threats, annoyances, petty oppressions, or other trivialities" that the *Monsanto* Court specifically defined as insufficient to establish an IIED claim. The Court also notes that, in this over-prescribed, highly medicated country, the simple fact that the plaintiff obtained a Xanax prescription fails to create a showing that "[t]he distress suffered … [is] such that no reasonable person could be expected to endure it." *Id.* at 1210. Summary judgment in favor of the Defendants is therefore granted.[4]

## **SHELTON'S SECTION 1983 CLAIM FOR RETALIATION AGAINST THE FOUNDATION, HUGHES, CLAYTON, FREEMAN AND MAGEE**

Shelton also brings a claim under 42 U.S.C. § 1983[5] against the Foundation, Hughes, and Board members Freeman, Clayton and Magee, alleging that his rights were violated by their actions as officials of Southern University. "To state a cause of action under § 1983, [plaintiff] must allege that some person, acting under state or territorial law, has deprived him of a federal right." *Green v. State Bar of Tex.*, 27 F.3d 1083, 1087 (5th Cir. 1994). Shelton asserts that the Board members illegally terminated him based on his protected activity of testifying in federal court and reporting sexual harassment in the workplace. He claims this violates his constitutional rights under the

---

[4] The Court notes that the Foundation failed to specifically address the IIED claim in either its motion to dismiss (Doc. 42) or its motion for partial summary judgment (Doc. 43), though it does briefly address the issue in its summary judgment reply brief (Doc. 52, pp. 15-16). Normally, an attempt to win summary judgment must be argued in the primary brief. However, the findings of the Court with respect to Shelton's IIED allegations against the other defendants apply equally to the Foundation, and therefore summary judgment in favor of the Foundation on the IIED claim is also granted.

[5] 42 U.S.C. § 1983 states in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.…"

First Amendment and under the equal protection and privileges and immunities aspects of the Fourteenth Amendment. The individual defendants—Board members Freeman, Clayton and Magee and Foundation director Hughes—argue that qualified immunity shields them from § 1983 liability in this case.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Governing case law provides a bifurcated analysis to determining qualified immunity. "[F]irst, a court must decide whether the facts alleged or shown are sufficient to make out a violation of a constitutional right; second, the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Quinn v. Roach*, 326 Fed.Appx. 280, 284 (5th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A constitutional right is "clearly established" if "the unlawfulness of the conduct would be apparent to a reasonably competent official." *Id.* at 285, n.2 (quoting *Conroe Creosoting Co. v. Montgomery County, Tex.*, 249 F.3d 337, 340 (5th Cir. 2001).

Shelton has clearly alleged deprivation of a constitutional right—the burdening of his exercise of First Amendment rights in testifying in the *Slaughter* litigation and in reporting sexual harassment by means of a retaliatory discharge. If the facts ultimately show such was the motive of the officials involved in the decision to terminate Shelton, they will have knowingly deprived him of his constitutional right to be free from retaliation for exercise of his constitutional rights. Defendants' argument that the adoption of the overall reorganization plan was "objectively reasonable" misses the

point.  It is not their action in implementing budget cuts by laying off workers in general that is the subject of the Court's evaluation; it is their choice to include Shelton's particular position in that plan that is being analyzed here.  The Court must determine whether facts exist which could show that motive on the part of each individual.

At the outset, the Court notes that Magee's role in this entire affair is nearly non-existent, as mentioned above regarding the abuse of rights claim against him.  The Court finds he is entitled to qualified immunity based on the absence of a genuine dispute regarding Magee's motive for retaliation.

Hughes' involvement in Shelton's termination is also attenuated.  Shelton has not brought forward sufficient facts showing that Hughes could have deprived him of his rights by relieving him of his assignment with the Foundation.  The publication of the letter allegedly accusing Shelton of misapprehending Foundation documents simply fails to suffice as a deprivation of a constitutional right.  While Shelton alleges it is defamatory, the Supreme Court has held that the circulation of a letter which allegedly damages an individual's reputation does not, without more, give rise to a constitutional violation.  *Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (citing *Paul v. Davis*, 424 U.S. 693 (1976) in upholding letter writer's claim to qualified immunity because "[d]efamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation.").  Hughes is therefore entitled to qualified immunity.  Because Hughes is entitled to immunity, the § 1983 claim against the Foundation must also be dismissed because no agent of the Foundation remains whose liability may be imputed to the Foundation.

Freeman and Clayton's roles in this matter, however, are slightly more pronounced. Freeman had the opportunity to talk with Shelton regarding his ongoing role with the university in light of the budget cuts and proposed reorganization plan. (Shelton Depo., Doc. 43-3, pp. 173-182). Freeman had the opportunity to include numerous positions in the reorganization plan, and affirmatively chose to include Shelton's position. The reason given for eliminating Shelton's position was that the position of his immediate superior was also eliminated. (Details of Reorganization Plan, Doc. 44-7, p. 11). That superior, Cedric Upshaw, also testified in the *Slaughter* litigation and has currently pending claims against the university and officials arising out of his termination. (*Id.*; *see Upshaw v. Board of Supervisors of Southern Univ.*, No. 10-cv-184-JJB, 2011 WL 2970950 (M.D.La. July 19, 2011)). Genuine disputes of material fact exist regarding whether she chose to include Shelton based on his testimony in favor of and his loyalty to her predecessor Slaughter. Genuine disputes also exist regarding whether a reasonable official in her shoes would have terminated Shelton. Qualified immunity is therefore denied to Freeman.

Clayton's role in the alleged acts is most prominent. Shelton brings up numerous allegations regarding his hostility towards Shelton arising from his *Slaughter* testimony. These instances would allow a reasonable factfinder to conclude that Clayton was knowingly violating Shelton's rights.[6] Qualified immunity is therefore improper for Clayton as well.

---

[6] The Court is aware that Clayton voted against the reorganization plan. (Doc. 44-11, p. 2). Whether this vitiates any § 1983 liability on his part remains an open question the Court need not address at this time.

To establish a First Amendment violation the plaintiff must establish that (1) he suffered an adverse employment decision; (2) the speech involved a matter of public concern; (3) the plaintiff's interest in commenting on the matter outweighed the defendants' interest in promoting efficiency; and (4) the speech motivated the defendants' adverse action. *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999). Harassment in the workplace has been found a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 148, n.8.

Shelton's termination obviously constitutes an adverse employment decision. His speech—the *Slaughter* testimony—involved a matter of public concern because sexual harassment allegations against high-ranking public university officials were made in open court. *See Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565 (holding employee testimony before official government adjudicatory bodies is inherently of public concern). In balancing the plaintiff's interest in commenting against the defendants' interest in efficiency, the Court finds the balance tips in favor of Shelton. Finally, the motive of the officials is the subject of fierce debate in this litigation. Whether Shelton's inclusion in the reorganization plan was motivated by a neutral need to cut the budget or a retaliatory animus towards his prior testimony is a question for the fact finder to resolve. Genuine disputes of material fact remain on this count, and therefore summary judgment in favor of either Clayton or Freeman on this claim is denied.[7]

---

[7] The parties failed to brief issues aside from qualified immunity related to the § 1983 claim, but each defendant has asked for summary judgment on all claims against them. Having resolved the issues of qualified immunity and found that Shelton has stated a § 1983 claim against Clayton and Freeman, the Court need not inquire into the second § 1983 claim against them alleging deprivation of 14th Amendment rights.

**SHELTON'S SECTION 1985 CLAIM FOR CONSPIRACY AGAINST THE**

**FOUNDATION, HUGHES, CLAYTON, FREEMAN AND MAGEE**

Shelton further brings a claim under 42 U.S.C. § 1985[8] against all defendants except the Board for conspiracy to violate his civil rights.  To established a § 1985 claim, a plaintiff must demonstrate that (1) two or more persons conspired (2) to directly or indirectly deprive him of the equal protection of the laws or equal privileges and immunities under the laws; and (3) one or more of the conspirators committed some act in furtherance of the conspiracy whereby (4) plaintiff was injured in his person or property or deprived of having and exercising some federally protected right or privilege; and (5) the conspirators' conduct was motivated by class-based animus.  Am.Jur.2d Civil Rights § 187 (2011); *Kimble v. D.J. McDuffy, Inc.*, 648 F.2d 340, 346-347 (5th Cir. 1981) (holding that § 1985(2)-(3) both require class-based animus).  Classes cognizable under § 1985 must exhibit either 1) inherited or immutable characteristics or 2) involve political beliefs or associations.  *McLean v. Int'l Harvester Co.*, 817 F.2d 1214, 1218 (5th Cir. 1987).  The Fifth Circuit has rejected the argument that whistleblowers are a protected class for purposes of § 1985 claims.  *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 687 (5th Cir. 2010).  In the context of § 1985(2), "only direct interference with the federal courts is prohibited."  *Kimble*, 648 F.2d at 348.  Thus, "[t]he question presented … is not whether Congress possesses the power to enact legislation

---

[8] 42 U.S.C. § 1985(2)-(3) states in pertinent part: "If two or more persons in any State … conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified … the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

forbidding retaliatory conduct against a party for filing suit in federal courts." *Id.* Rather, based on the congressional history of the Ku Klux Klan Act of 1871, which created § 1985, the Fifth Circuit held that "Congress meant Section 1985(2) to protect a party based on his physical presence while attending or testifying in court." *Id.* This has been referred to as the "nexus" test. *Bradt v. Smith*, 634 F.2d 796 (5th Cir. 1981).

Shelton has simply failed to argue that any conspiracy was hatched with the purpose of discriminating against him based on his membership in a protected class. He does not allege that any animus existed based on his race, sex, or political beliefs. He bases the conspiracy allegation solely on the fact that he previously testified in a federal case. This does not bring his claim within the ambit of § 1985(2). The interference with his federal testimony was not direct in that no allegation has been made that his physical presence at the proceeding was interfered with, or that threats were made with the purpose of intimidating him into not testifying. Acts of retaliation for such testimony, as the Fifth Circuit noted in *Kimble*, fail to state a claim under § 1985. Shelton's § 1985 claims against all defendants must therefore be dismissed.

## CONCLUSION

Based on the foregoing, the Court hereby GRANTS the Foundation's Motion to Dismiss (Doc. 42) the plaintiff's § 1985 claim against it with prejudice.

The Court GRANTS in part and DENIES in part the Foundation's Motion for Partial Summary Judgment (Doc. 43). The claims against the Foundation arising under Title VII, La.R.S. 23:967, § 1983, Louisiana's abuse of rights doctrine, and the intentional infliction of emotional distress claim are hereby DISMISSED. The claim for defamation remains pending.

The Court also GRANTS in part and DENIES in part the other defendants' Motion for Summary Judgment (Doc. 44). The claims against the Board under Title VII and the abuse of rights doctrine remain pending. The defamation claim against Hughes remains pending. The § 1983 and abuse of rights claims against Freeman and Clayton remain pending. The intentional infliction of emotional distress claims against all defendants are hereby DISMISSED. The § 1983 and abuse of rights claims against Magee and Hughes are also DISMISSED. The § 1985 claims against all defendants are hereby DISMISSED.

Signed in Baton Rouge, Louisiana, on <u>September 9, 2011</u>.

_____
**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**